**Affirmed and Opinion Filed December 13, 2022**



In The
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-21-00286-CV**

**LESLIE BEAN, Appellant**
**V.**
**AMY SUE BEAN, Appellee**

**On Appeal from the Probate Court No 2**
**Harris County, Texas**
**Trial Court Cause No. 467,316-402**

## OPINION

Before Justices Partida-Kipness, Reichek, and Goldstein
Opinion by Justice Partida-Kipness

This probate-related appeal presents the Court with an issue of first impression concerning the proper marital characterization of property utilized or received by an astronaut during Apollo-era space programs. Such "artifacts" were in the decedent Alan Lavern Bean's (Alan's) possession before his 1982 marriage to appellant Leslie Bean (Leslie). Alan consistently characterized the artifacts as his separate property, and Congress confirmed "full ownership" and "clear title" of such artifacts in 2012 when it enacted H.R. 4158. *See* Owners and Ownership—Artifacts of Astronauts, Pub. L. No. 112-185, 126 Stat. 1425 (2012) ("An Act To confirm full ownership rights for certain United States astronauts to artifacts from the astronauts' space

missions."). The probate court concluded thirty-nine artifacts were Alan's separate property. Leslie appeals[1] that ruling. Finding no error, we affirm.

## BACKGROUND

Alan was a NASA astronaut in the 1960s and 1970s. In November 1969, Alan made his first flight into space as a member of the Apollo 12 crew. During that mission, Alan became the fourth man to walk on the Moon. In 1973, he served as Commander of NASA's Skylab III mission. During his career at NASA, Alan obtained many artifacts and mementos, some of which were items brought back from his two space missions. Alan had many of those "space artifacts" in his possession at the time of his death. The overarching question on appeal is whether the trial court erred by characterizing thirty-nine of those artifacts as Alan's separate property for purposes of probating Alan's estate.

## I.   Alan's First Marriage

Alan married his first wife, Sue Ragsdale Bean (Sue), in 1955. He and Sue had two children, appellee Amy Sue Bean (Amy) and Clay Bean (Clay). Amy is Alan's sole-surviving child.[2] Alan and Sue separated in April 1976, and divorced on October 7, 1976. As part of the divorce, Alan and Sue voluntarily entered into a Property Settlement and Division Agreement (the property settlement), which

---

[1] This appeal was transferred to this Court from the Fourteenth District Court of Appeals in Houston pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE § 73.001. Because this is a transfer case, we apply the precedent of the Fourteenth Court of Appeals to the extent it differs from our own. *See* TEX. R. APP. P. 41.3.

[2] Although Clay survived his father, he died on December 6, 2019.

divided the community property and designated the parties' separate property. Exhibit A to the property settlement listed Alan's personal property. That list of personal property included:

- "All space pictures, mementos, awards."

- "Alan Bean's desk and contents, chair and lamp. All books, awards, artifacts, etc." in Alan's study.

- "½ of all space flown Apollo and Skylab flags and medallions."

- "N.A.S.A. documents" in Clay's bedroom.

Alan retired from NASA and the United States Air Force in 1981.

## II.     Alan's Second Marriage

Alan married Leslie, his second wife, in 1982. Before the marriage, Alan and Leslie entered into an Agreement in Contemplation of Marriage (the prenuptial agreement), which they signed on July 15, 1982. The stated purpose and intent of the prenuptial agreement was to allow Alan and Leslie to each "continue to own and to manage his or her separate property," and own all increases from and bear all obligations and liabilities of their respective separate property. Under the prenuptial agreement, Alan and Leslie defined "separate property" as:

> [C]onsisting of all property owned or claimed by the respective parties prior to marriage, the property acquired by said party during marriage by gift, devise or descent, and any recovery for personal injuries sustained by the party during marriage, except any recovery for loss of earning capacity during marriage, together with any traceable or identifiable change in form or mutation of such property.

They further agreed to the following concerning their separate property:

> Separate Property of the Parties. All of the properties, both real and personal, owned by each of the parties, respectively, as of the date of this Agreement and as of the date of the marriage are hereby declared, respectively, to be the separate property of such party; in addition, all properties which are acquired after the marriage by each of the parties, respectively, shall, to the extent acquired by gift, devise or descent or by purchase with or exchange for separate property or obligations binding only on separate property, be and remain the separate property of such party.

The prenuptial agreement further stated "[f]or the purpose of segregating the properties of the parties," Alan's separate property was set forth in Exhibit A attached to the agreement, and Leslie's separate property was set forth in Exhibit B.

The three-page list of Alan's separate property on Exhibit A to the prenuptial agreement stated Alan's separate property consisted of "[a]ll items owned by Alan L. Bean as of July 15, 1982" including but not limited to the items listed in Exhibit A. The list included the following space-related items:

- "All space related photographs, models, mementos, awards, coins, stamps, souveniers [sic], jewelry except for one Apollo 12 silver medallion." (¶ 6);

- "All flags, jewelry, medallions, and other items that were taken by Alan L. Bean on space flights." (¶ 7);

- "All contents" of Alan's carved desk. (¶ 21).

In addition to the separate property listed in Exhibits A and B, Alan and Leslie agreed that any property acquired after the marriage "by gift, devise or descent or by purchase with or exchange for separate property or obligations binding only on separate property" would remain the separate property of the party acquiring it.

–4–

## III.    Alan's Will

Alan signed his Last Will and Testament (the Will) on April 25, 2007. The Will mentions and incorporates the property settlement and the prenuptial agreement and emphasizes Alan's desire and intent to segregate his separate property, as set out in Exhibit A to the prenuptial agreement, from his and Leslie's community property. In the Will, Alan updated the status of the items listed in Exhibit A to the prenuptial agreement. Alan confirmed the items referencing space artifacts in Exhibit A were within Alan's possession at the time he executed the Will.

The Will states several times that Alan believes the items listed as his separate property in the prenuptial agreement and in the Will are his separate property and should be disbursed upon his death as he sets out in the Will:

- "I updated the information under this Section because I want the reader to know this Will and the Exhibits that are attached for reference purposes only clearly identify and enumerate those items that are my separate property. Consequently, for good reason, I direct my Executors and/or Trustees to rely on this Will| with confidence when identifying, inventorying, appraising, giving, devising, and bequeathing my separate property."

- "Because of my experiences as a NASA Astronaut and my later career as a dedicated artist, I am giving and bequeathing my personal property with very specific instructions."

- "I direct my Executors and/or Trustees to fully, faithfully, and aggressively comply with the Sections entitled *"My Separate Property – A Precise Look After More Than 24 Years"* through and including *"My Copyrights and Royalties."*"

The sections of the Will entitled *"My Separate Property – A Precise Look After More Than 24 Years"* through and including *"My Copyrights and Royalties"*

comprise fifteen pages of the Will, include detailed descriptions of property, and provide extensive, detailed instructions for how each item of property should be handled upon Alan's death.

In the first section, titled *"My Separate Property – A Precise Look After More Than 24 Years,"* Alan listed several personal items that "were retained" as Alan's separate property, including his "space artifacts, mementos, coins, stamps, envelopes (covers), and medallions" and his "personal desk." The Will states each of the items in that list "is conveyed under specific Sections of this Will, which follow."

In the next section titled *"A Roadmap for My Property's Distribution,"* Alan states he is "giving and bequeathing my personal property with very specific instructions" and "I have not conveyed any of my property (including . . . space artifacts and mementos) at the time this Will was signed." Alan also included instructions for how to determine if Alan conveyed any separate property after signing the Will. Specifically, Alan stated he "will issue the beneficiary a notarized written receipt to that effect." He instructed the trustees and executors to use the existence of a notarized written receipt as a litmus test for ownership. If a party claiming ownership could not produce a receipt, then the trustees and executors were instructed to presume Alan did not promise the property to the alleged claimant, and the person does not own the property.

In the section titled *"NASA Property, Which was Given to Me, That is in My Possession,"* Alan states "certain artifacts, which flew aboard" the Apollo 12 and

Skylab 3, Mission II flights were given to him by "NASA through officials at the Johnson Space Center." The Will states those artifacts are Alan's "personal property and should not be returned to NASA nor should they be brought to the undue attention of the U.S. Government." Those artifacts "include, but are not limited to the following items":

- Alan's Apollo Suit Patch and PLSS Patches

- Alan's Apollo 12 Hammer

- Alan's Apollo 12 Checklist

- Alan's Apollo 12 Core Tube Bit

According to the Will, Alan used the hammer on the Moon. The hammer was scheduled to be left on the Moon, but Alan brought it back with him instead. Alan states in the Will that "NASA reviewed the situation and said the hammer was mine to keep." For each item in the list, Alan suggested how the item should be handled by his co-executors. He "strongly" encouraged the co-executors to keep his Apollo suit patch and PLSS patches but allow them to be displayed in a museum replica of his studio. He suggested the co-executors "loan but not give" the Apollo 12 hammer, Apollo 12 checklist, and Apollo 12 core tube bit to the National Air and Space Museum. Alan also explained he did not want the National Air and Space Museum to be given those items permanently:

> Based on my past dealings with the officials at the Air and Space Museum, I know they will want my co-executors to give [the Apollo 12 Core Tube Bit] to the Museum, but my instructions need to be clear. "Do not do this! Only loan this artifact."

Finally, under the section titled *"My Space Artifacts and Mementos,"* Alan stated "All of my space artifacts and mementos are my separate property, which are listed under Exhibit 'A'. "[3] The Exhibit "A" referenced in the Will is identical to Exhibit A attached to the prenuptial agreement. Alan also described where to find his "space artifacts and mementos":

> For reference, most of my space artifacts and mementos are located in the drawers of my desk, in the top drawer of the tall chest to the left of my desk, all around the third floor of our personal residence, and on the white chest in the third floor [sic] closet.

Alan instructed Clay's trustee and Amy's trustee "to distribute the artifacts and mementos so that shares of equal value are conveyed" and the Trustees' decisions "are binding and final." Alan appointed Leslie and Amy as co-executors of his estate. He also included a provision for the appointment of a third co-executor with "authority limited to any issue(s) for which my wife and my daughter disagree" and whose decisions "are to break any ties between my wife and my daughter and therefore be binding and final."

## IV.  Probate Proceedings

Alan died on May 26, 2018. The probate court appointed Amy and Leslie independent co-executors of Alan's estate in accordance with the Will. Unfortunately, Amy and Leslie could not agree on many issues concerning the

---

[3] Alan states in the Will that three items acquired during his time with NASA were merely loaned to him by NASA and "must be returned to NASA as soon as possible" after his death. Those items are two Skylab gloves, "the Apollo helmet," and "a suit hose and two hose connectors." Those items are not included in the thirty-nine artifacts at issue in this appeal.

–8–

administration of the estate. On April 17, 2019, Amy filed an application for issuance of letters testamentary to appoint Tom Kartsotis as the tie-breaking independent co-executor. Amy explained in the application that she and Leslie could not agree "upon various administration matters," and an independent co-executor to act as a tie-breaker should be appointed as provided for in the Will. The probate court signed an order appointing Tom on May 7, 2019.

On August 26, 2019, Leslie filed a Form 706[4] with the Internal Revenue Service. Under penalty of perjury, she reported all but four of Alan's space items, artifacts, mementos, and memorabilia as Alan's separate property. According to Amy, the Form 706 filing showed that "the property characterization of the space artifacts and mementos as Alan's separate property was not in dispute" when she requested Tom's appointment.

Nonetheless, in a memorandum to Tom's counsel dated September 12, 2019, Leslie submitted five issues for Tom to consider in his capacity as tie-breaker. "Issue # 5" referenced the division of "space artifacts and mementos." Leslie asserted the following items were not Alan's separate property because they were merely on loan to Alan from NASA when she and Alan signed the prenuptial agreement in 1982: (1) Apollo hammer, (2) Apollo cuff checklist, (3) Apollo core bit tube, (4) Apollo suit patches, (5) Skylab gloves, (6) suit/hose connectors, (7) Apollo clip, and (8)

---

[4] "The executor of a decedent's estate uses Form 706 to figure the estate tax imposed by Chapter 11 of the Internal Revenue Code." *About Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return*, https://www.irs.gov/forms-pubs/about-form-706#.

Apollo helmet. At the hearing on Amy's motion for partial summary judgment, Leslie's counsel confirmed Leslie sought Tom's tie-breaker determination as to only those items, and Tom's counsel maintained that Tom's decisions were limited to those items. Tom, however, made a much broader finding. In a February 20, 2020 email to counsel, Tom interpreted HR 4158 and decided "title to space artifacts in Alan's possession had not been vested in Alan prior to the date of House Bill 4158 and therefore constituted community property at his death."

Amy viewed this determination as counter to Alan's intent as stated in his Will, the law, the prenuptial agreement, and Leslie's sworn Form 706 filing. She also believed Tom's determination was beyond the scope of his tie-breaking authority as to non-legal, administrative matters. That prompted Amy to file a petition for declaratory judgment concerning various aspects of the Estate's administration. The petition included Amy's request for a declaration that Alan's space artifacts and mementos belong to Alan's estate and are characterized as his separate property.

Ultimately Amy filed her second amended motion for partial summary judgment, in which she asserted certain "space artifacts and mementos" should be characterized as Alan's separate property. She moved the probate court to declare the following items Alan's separate property:

- The Apollo suit patch and PLSS patches, the Apollo 12 Hammer, the Apollo 12 Cuff Checklist, and the Apollo 12 Core Tube Bit;[5] and

- The space artifacts and mementos listed on Exhibit A to the Will and Exhibit A to the prenuptial agreement, which encompassed all items owned by Alan as of July 15, 1982.

In response, Leslie maintained Tom's decision was final and binding and, as such, ownership in the space artifacts and mementos vested in Alan when HR 4158 was enacted on October 5, 2012. Because Alan did not "own" the items on July 15, 1982, they were not included in the list of separate property found in Exhibit A to the prenuptial agreement. Leslie further argued Amy failed to defeat the presumption of community property because the items were not "owned" by Alan before his marriage to Leslie or "acquired" by Alan by "gift, devise or descent."

The hearing transcript reflects confusion among counsel and the probate judge concerning which specific items the court was being asked to characterize. Amy submitted a proposed order with her motion listing 243 items included by Leslie as "Space Items, Artifacts and Memorabilia" in her Form 706 tax filing. Amy informed the probate court at the hearing that she was not seeking a ruling on all 243 items. Rather, she sought a ruling only on item numbers 1 through 167 from her proposed order. Those items had been appraised by Sotheby's before the Rule 706 tax filing, whereas items 168 through 243 had not been appraised. Leslie conceded 128 of the

---

[5] Those Apollo items were also included in the list of items identified by Leslie as "Space Items: Artifacts and Memorabilia" in her 2019 Form 706 Estate Tax Return.

–11–

167 items at issue were Alan's separate property because he owned those items before their marriage. The probate court ruled on the remaining thirty-nine items (the 39 Space Artifacts). Those are the rulings at issue on appeal.

In a December 23, 2020 order, the probate court granted Amy's motion in part and characterized the 39 Space Artifacts as Alan's separate property. The trial court severed the December 23, 2020 summary judgment order into a new cause number. This appeal followed.

## STANDARD OF REVIEW

In four issues, Leslie contends the probate court erred by granting Amy's motion for summary judgment. We review orders granting summary judgment de novo. *Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 84 (Tex. 2018). If no grounds are specified for the ruling, we must affirm on any meritorious grounds on which judgment was requested. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013). With respect to a traditional motion for summary judgment, we require the movant to demonstrate the absence of a genuine issue of material fact and her entitlement to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Provident Life & Acc. Ins. Co. v. Knott*, 128 S.W.3d 211, 215–16 (Tex. 2003). If the movant satisfies this burden, to avoid summary judgment the nonmovant then bears the burden of demonstrating a genuine issue of material fact. *Lujan*, 555 S.W.3d at 84. We credit all evidence favoring the nonmovant, indulging every reasonable

inference and resolving all doubts in its favor. *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 208 (Tex. 2002).

## THE 39 SPACE ARTIFACTS

The December 23, 2020 order includes a numbered list of the 39 Space Artifacts. Leslie challenges the probate court's characterization of the 39 Space Artifacts as Alan's separate property. On appeal, however, she divides the 39 Space Artifacts and her challenges to their characterization into two categories: "the 2012 Space Artifacts" and "the other space artifacts." Leslie's first two issues focus on "the 2012 Space Artifacts," her third issue addresses "the other space artifacts," and her final issue relates to the 39 Space Artifacts as a whole.

Unfortunately, the items Leslie includes in each category are a moving target. When she defines the term "2012 Space Artifacts" in her brief, she states those items were "Government-owned space artifacts" that included 20 of the 39 Space Artifacts. (Br. at 1–3). In her statement of facts, however, Leslie states 34 of the 39 Space Artifacts are included in her definition of "2012 Space Artifacts" and were erroneously characterized as community property. (Br. at 21). That number changes again within Leslie's argument section of the brief. When discussing the community property presumption related to the "other space artifacts," Leslie listed 16 items as "other space artifacts," which left 23 items characterized as "2012 Space Artifacts."

–13–

The record and oral argument did not clarify this issue. What is clear, however, is Leslie never defines the following items[6] as part of the "2012 Space Artifacts":

- Biomedical Harness worn by Bean LM-6 Apollo 12

- Silver Skylab 2 (Mission I) Robbins Medallion Serial No. 12 Flown

- Silver Skylab 2 (Mission I) Robbins Medallion Serial No. 294 Unflown

- Skylab 2 Mission Emblem Sticker

For purposes of our analysis of Leslie's first two issues, we will treat the remaining thirty-five items as included in the "2012 Space Artifacts" category. As for her third issue, we will treat the sixteen[7] items addressed by Leslie in her brief as "other space artifacts." As discussed below, however, this delineation is superfluous because we conclude the 39 Space Artifacts were properly characterized as Alan's separate property regardless of how Leslie characterized the items.

## ANALYSIS

Leslie challenges the probate court's characterization of the 39 Space Artifacts as Alan's separate property. She argues the characterization was erroneous because (1) NASA, not Alan, owned the 2012 Space Artifacts in 1982, (2) Alan did not acquire title to the 2012 Space Artifacts until 2012 with the passage of HR 4158, (3) Amy did not overcome the community property presumption regarding the other

---

[6] These items are item numbers 1, 34, 35, and 38 in the December 23, 2020 order.

[7] Leslie defines "the other space artifacts" as item numbers 1 through 13, 34, 35, and 38.

space artifacts, and (4) Tom's decision that the space artifacts were community property was final and binding.

## I.  Characterization of the 2012 Space Artifacts

Leslie's first two issues address the 2012 Space Artifacts. She does not dispute that Alan had those items in his possession as of July 15, 1982. Rather, she maintains Alan did not own the items as of July 15, 1982 because (1) they were "Government-owned" items that NASA instructed Alan to return, and (2) Alan did not obtain title to the items until Congress passed HR 4158 in 2012, which was during the marriage. We disagree and will address each argument separately.

### A.  Lack of ownership in 1982

Leslie first asserts the 2012 Space Artifacts cannot be characterized as Alan's separate property because he possessed but did not own those items before the marriage. A spouse's separate property is "the property owned *or claimed by* the spouse before marriage" and includes property acquired by the spouse during marriage by gift, devise, or descent. TEX. FAM. CODE § 3.001 (emphasis added); TEX. CONST. art. XVI, § 15 ("All property, both real and personal, of a spouse owned *or claimed* before marriage, and that acquired afterward by gift, devise or descent, shall be the separate property of that spouse . . . .") (emphasis added). Here, the record conclusively shows that Alan claimed the 2012 Space Artifacts as his separate property before the marriage.

Alan consistently treated the artifacts as his separate property before and after he married Leslie. When divorcing his first wife, he entered a property settlement agreement designating his space artifacts and mementos as his separate property. He again designated those items as his separate property in the prenuptial agreement with Leslie. Alan was already retired from NASA when he married Leslie, and she does not dispute Alan had the 2012 Space Artifacts in his possession as of July 15, 1982. Moreover, Leslie agreed the 2012 Space Artifacts were Alan's separate property by signing the prenuptial agreement and listing those items as his separate property in her Form 706 tax filing. Under this record, we conclude the 2012 Space Artifacts were properly characterized as Alan's separate property because he consistently claimed the property as his separate property. *See*, *e.g.*, *In re Marriage of Douthit*, 573 S.W.3d 927, 930 (Tex. App.—Amarillo 2019, no pet.) (evidence that husband claimed the tract of land was his before marriage, even though he had not yet obtained the legal title or evidence of title property, was sufficient to characterize the property as husband's separate property).

## B.    H.R. 4158

The United States Senate and House of Representatives enacted H.R. 4158 as Public Law 112–185 on October 5, 2012. Owners and Ownership—Artifacts of Astronauts, Pub. L. No. 112-185, 126 Stat. 1425 (2012) ("An Act To confirm full ownership rights for certain United States astronauts to artifacts from the astronauts' space missions."). Leslie contends H.R. 4158 made the 2012 Space Artifacts

community property because the legislation transferred title to Alan in 2012 during the marriage. We disagree.

In construing a statute, our ultimate purpose must be to give effect to the Legislature's intent. *Union Bankers Ins. Co. v. Shelton*, 889 S.W.2d 278, 280 (Tex. 1994). We resort to rules of construction only when the statute in question is ambiguous. *Ex parte Roloff*, 510 S.W.2d 913, 915 (Tex. 1974). When the meaning of an existing law is uncertain, the Legislature's later interpretation of it is highly persuasive. *Tex. Water Comm'n v. Brushy Creek Mun. Util. Dist.*, 917 S.W.2d 19, 21 (Tex. 1996); *Stanford v. Butler*, 181 S.W.2d 269, 274 (Tex. 1944).

HR 4158 first defines "artifact" and then confirms "full ownership" and "clear title" of such artifacts on certain United States astronauts:

### SECTION 1. DEFINITION OF ARTIFACT.

For purposes of this Act, the term "artifact" means, with respect to an astronaut described in section 2(a), any expendable item utilized in missions for the Mercury, Gemini, or Apollo programs through the completion of the Apollo–Soyuz Test Project not expressly required to be returned to the National Aeronautics and Space Administration at the completion of the mission and other expendable, disposable, or personal-use items utilized by such astronaut during participation in any such program. The term includes personal logs, checklists, flight manuals, prototype and proof test articles used in training, and disposable flight hardware salvaged from jettisoned lunar modules. The term does not include lunar rocks and other lunar material.

### SEC. 2. FULL OWNERSHIP OF ARTIFACTS.

(a) IN GENERAL.—A United States astronaut who participated in any of the Mercury, Gemini, or Apollo programs through the completion of the Apollo–Soyuz Test Project, who received an artifact during his

–17–

participation in any such program, shall have full ownership of and clear title to such artifact.

(b) NO FEDERAL GOVERNMENT CLAIM.—The Federal Government shall have no claim or right to ownership, control, or use of any artifact in possession of an astronaut as described in subsection (a) or any such artifact that was subsequently transferred, sold, or assigned to a third party by an astronaut described in subsection (a).

*Id.* at 1425–26. President Barack Obama signed HR 4158 into law on October 5, 2012. The White House Press Secretary stated the act "confirms full ownership for U.S. astronauts who participated in the Mercury, Gemini, or Apollo programs of artifacts from their space missions." STATEMENT BY THE PRESS SECRETARY, 2012 WL 4751794, at *1 (White House, Oct. 5, 2012).

Applying the plain language of the statute, we conclude H.R. 4158 did not provide Apollo-era astronauts new ownership rights in the artifacts defined in the Act. Rather, H.R. 4158 simply "confirmed" what those astronauts believed for decades: that they owned and had clear title to the artifacts. The legislative history and commentary concerning the Bill support this conclusion.

The House of Representatives debated and confirmed H.R. 4158 on September 19, 2012. 158 CONG. REC. H6086-01 (daily ed. Sept. 19, 2012), 158 CONG. REC. H6086-01, at *H6086 (Westlaw 2012 WL 4120031). Several representatives spoke in favor of H.R. 4158. In those statements, they emphasized the need to "confirm" that astronauts own and have legal title to the artifacts defined in H.R. 4158. For example, when explaining the history and purpose of the Act, Congressman Ralph Hall stated H.R. 4158 "would confirm full ownership rights" in

the artifacts to the Apollo-era astronauts. He went on to explain the history of the astronauts' ownership of the artifacts:

> From the first days of our manned spaceflight program through the Apollo-Soyuz Test Project, at the conclusion of a mission NASA managers routinely allowed astronauts to keep mementos of their flights. In some instances, astronauts were also given certain pieces of expendable equipment. The range of items included space suit emblems, expendable space suits, checklists, flight manuals, and disposable flight hardware salvaged from the jettisoned lunar landers.
>
> A majority of these items have been in the personal possession of the astronauts for 40 years or more. Over the last decade, NASA has begun to challenge the astronauts' ownership of these mementos. This issue was first brought to my attention late last year. I was surprised to learn that NASA had, on an irregular basis, intervened several times to claim ownership.
>
> ***
>
> This bill seeks to eliminate in any further ambiguity about Apollo-era artifacts that were received by the astronauts. It simply says that astronauts who flew through the end of the Apollo program will be granted full right of ownership of any artifacts received from their missions. If we don't pass this bill, the artifacts and the astronauts face huge financial risks arising from donations, gifts, and sales already completed.
>
> These men are heroes. They're great heroes. Sadly, we had to say good-bye to one of these heroes just last week. They took extraordinary risks to establish American preeminence in space and, by doing so, helped our country become a world leader. I think it's a miscarriage of justice that today NASA should seek return of these very same mementos and keepsakes.

158 CONG. REC. H6086-01, 158 Cong. Rec. H6086-01, at *H6086.

Other House Members spoke in favor of H.R. 4158 and echoed Representative Hall's thoughts. For example, Representative Eddie Bernice Johnson called H.R. 4158 "a necessary bill which will protect our iconic early astronauts from needless

harassment. This bill will ensure that any U.S. astronaut who participated in the historic Mercury, Gemini, or the Apollo programs will be able to keep the space artifacts which are still in their possession from those missions." *Id.* (statement of Rep. Johnson). Representative Johnson went on to explain why such protections were needed:

> At the time of these missions, it was accepted practice that astronauts could keep expendable equipment like checklists and hygiene kits as mementos of their missions. However, this was an informal policy, and those astronauts lacked paperwork establishing ownership over these items.

> This bill will protect those astronauts from any claims made by the Federal Government regarding any of these artifacts. Further, the bill protects our national interest by ensuring that any lunar rocks or other lunar material remain property of the United States.

*Id.* Representative Lamar Smith shared those sentiments and further explained why a bill clarifying ownership of the artifacts was imperative:

> The problem this bill addresses is to confirm the ownership of mementoes the Apollo astronauts received from their journeys. I was first contacted one year ago about this problem by my constituent, Apollo 16 moonwalker Charlie Duke, who now lives in New Braunfels, Texas and also chairs the Astronaut Scholarship Foundation.

> The Scholarship Foundation is one of the beneficiaries from the sale of such artifacts, and they have provided over $3 million in scholarships to college students studying science and engineering so they too can aspire to be astronauts.

> At the end of the Apollo program, these mementoes were deemed to be of little value, and NASA was simply going to throw many of these items in the trash heap of history-checklists with scribbled equations and calculations in the margins, a camera and other personal effects the Apollo astronauts were offered to keep for themselves.

> However, in the intervening 40 years, these mementoes took on a greater historical context, just like mementoes from past wars or famous people take on greater significance. Unfortunately, over-zealous NASA and the Justice Department lawyers recently started filing law suits against Apollo astronauts-our American heroes-and started questioning their integrity.
>
> This is wrong. And this bill clarifies the ownership of these artifacts in the possession of our astronauts.

*Id.* at *H6088 (statement of Rep. Smith). Similarly, Representative Jerry F. Costello told House Members he supported H.R. 4158 "because it clarifies that the ownership of those artifacts rests with the astronauts who served during those missions, while preserving the current policy that ownership of moon rocks and lunar material will continue to rest with the Federal Government." 158 CONG. REC. E1581-01 (daily ed. Sept. 20, 2012), 158 CONG. REC. E1581-01, at *E1581 (Westlaw 2012 WL 4207964) (speech of Rep. Costello). Representative Costello urged the House to pass H.R. 4158 as a way to thank the Apollo-era astronauts for fulfilling "the dreams of a grateful nation by pushing the boundaries of space." *Id.* The plain language of the statute and the legislative history support a conclusion that H.R. 4158 confirmed and clarified Alan's ownership rights to the 39 Space Artifacts and did not create new property rights in those items.

H.R. 4158 can also be reasonably construed as giving the space artifacts to the astronauts as either gifts or compensation. As Representative Costello told the House, the artifacts should be given to Apollo-era astronauts by "a grateful nation" to thank the astronauts for their brave and heroic actions. Gifts acquired during

–21–

marriage are characterized as separate property. TEX. FAM. CODE § 3.001 (separate property includes "property acquired by the spouse during marriage by gift, devise, or descent."); TEX. CONST. art. XVI, § 15 (separate property includes property acquired after marriage by gift). As gifts, there is no presumption the artifacts belong to the community estate. The same is true if the artifacts are considered compensation under H.R. 4158. Alan never worked as an astronaut during his marriage to Leslie. Any "payment" to Alan of space artifacts and mementos is, therefore, his separate property. *See*, *e.g.*, *Moore v. Moore*, 192 S.W.2d 929, 930–31 (Tex. App.—Fort Worth 1946, no writ) ("Moneys received by an ex-soldier after marriage for services rendered to the government prior to marriage become his separate property. If the 'bonus money' received by appellee in this case were additional compensation to that formerly paid by the government to him for services rendered, the services were performed before marriage, and his rights thereto existed at the time of marriage . . . ."). Either way, those artifacts would be Alan's separate property as a matter of law.

II.     **Community property presumption as to the "other space artifacts"**

Leslie's third issue relates to "the other space artifacts," which she contends were not in Alan's possession before their marriage. A spouse's separate property is "the property owned or claimed by the spouse before marriage" and includes property acquired by the spouse during marriage by gift, devise, or descent. TEX. FAM. CODE § 3.001; TEX. CONST. art. XVI, § 15. Property possessed by either spouse

–22–

during or on dissolution of the marriage, however, is presumed to be community property. TEX. FAM. CODE § 3.003(a); *Sink v. Sink*, 364 S.W.3d 340, 344 (Tex. App.—Dallas 2012, no pet.). To overcome the community property presumption, the spouse claiming certain property as separate must trace and clearly identify the property through clear and convincing evidence "showing the time and means by which the spouse originally obtained possession of the property." *Sink*, 364 S.W.3d at 344; *see also* TEX. FAM. CODE § 3.003(b). Separate property will retain its character through a series of exchanges so long as the party asserting separate ownership traces the assets back to property that, "because of its time and manner of acquisition, is separate in character." *Sink*, 364 S.W.3d at 344–45.

"The burden of tracing is a difficult, but not impossible, burden to sustain." *Id.* at 344. It involves establishing the separate origin of the property through "evidence showing the time and means by which the spouse originally obtained possession of the property." *Id.* To establish that property is separately owned, a party must offer clear and convincing evidence of that fact. TEX. FAM. CODE § 3.003(b). "Clear and convincing" evidence means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002); *Matter of Marriage of Murgola & Blythe*, No. 14-21-00139-CV, 2022 WL 3365264, at *2 (Tex. App.—Houston [14th Dist.] Aug. 16, 2022, no pet.) (mem.

op.). Any doubt as to the character of property is resolved in favor of the community estate. *Sink*, 364 S.W.3d at 345.

In general, the characterization of property is determined by the time and circumstances of its acquisition, often referred to as the "inception of title" doctrine. *Rivera v. Hernandez*, 441 S.W.3d 413, 420 (Tex. App.—El Paso 2014, pet. denied) (citing *Scott v. Estate of Scott*, 973 S.W.2d 694 (Tex. App.—El Paso 1998, no pet.)). "Inception of title occurs when a party first has a right or claim to the property by virtue of which title is finally vested." *Pettitt v. Pettitt*, 704 S.W.2d 921, 924 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.); *see also Parnell v. Parnell*, 811 S.W.2d 267, 269 (Tex. App.—Houston [14th Dist.] 1991, no writ); *John Hancock Mut. Life Ins. Co. v. Bennett*, 128 S.W.2d 791, 795 (Tex. 1939); *Winkle v. Winkle*, 951 S.W.2d 80, 88 (Tex. App.—Corpus Christi–Edinburg 1997, writ denied). If the inception of title predated the marriage, then the property may be characterized as separate property, but if the inception of title occurred after the marriage began, then the property is generally considered to be community property. *Attaguile v. Attaguile*, 584 S.W.3d 163, 173 (Tex. App.—El Paso 2018, no pet.) (first citing *Willett v. Rodriguez*, No. 03-16-00084-CV, 2017 WL 2417831, at \*2 (Tex. App.— Austin June 2, 2017, pet. denied) (mem. op.), then citing *Tarver v. Tarver*, 394 S.W.2d 780, 783 (Tex. 1965)).

To establish the award as separate property, a party must merely show that before the marriage he had a right to claim the property, he pursued that right, and

the right later ripened. *Smith v. Smith*, 22 S.W.3d 140, 144–45 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (damages recovered in lawsuit after the marriage were Smith's separate property because he suffered the damages before the marriage). The fact that the right is unenforceable at inception is irrelevant:

> The status of the property of marital partners is determined by the time and circumstances attending its "acquisition." It is therefore helpful to keep in mind what is meant by "acquired." The term signifies the origin or inception of the right, rather than its later ripening or fruition.

SPEER'S MARITAL RIGHTS IN TEXAS § 388 (4th ed.); *see Roach v. Roach*, 672 S.W.2d 524, 530–31 (Tex. App.—Amarillo 1984, no writ) ("Moreover, it is a familiar principle of law that the separate or community character of property is determined not by the acquisition of the final title . . . but by the origin of title to the property."). In other words, a party's right to claim property as one's separate property is "not required to vest completely before marriage." *Smith*, 22 S.W.3d at 144–45.

For example, in *Smith*, the husband was damaged in an accident before his marriage but did not recover damages until after the marriage. 22 S.W.3d at 144–45. The court concluded the damages recovered were the husband's separate property because he suffered the damages before the marriage. *Id.* Similarly, when real property is acquired under a contract for deed or installment contract, the inception of title occurs when the contract was executed, not when legal title is conveyed. *In re Marriage of Morris*, 123 S.W.3d 864, 871 (Tex. App.—Texarkana 2003, no pet.) (citing *Wilkerson v. Wilkerson*, 992 S.W.2d 719, 722 (Tex. App.—Austin 1999, no

pet.)); *Pettitt*, 704 S.W.2d at 924 ("fee title to the realty was the husband's separate property since it was acquired by him prior to marriage").

A party's own testimony is sufficient to rebut the community property presumption if it is uncontroverted. For example, in *Sanchez v. Wales*, No. 05-20-00485-CV, 2022 WL 1055376, at *4 (Tex. App.—Dallas Apr. 8, 2022, no pet.) (mem. op.), the husband offered sufficient evidence to rebut the community property presumption by presenting uncontroverted, clear and convincing evidence that the funds used to purchase the property at issue were his separate assets. We noted in *Sanchez* that "the record contains no evidence suggesting that the funds at issue were actually derived from some other source." Similarly, we concluded in *Pace v. Pace*, 160 S.W.3d 706, 714 (Tex. App.—Dallas 2005, pet. denied) that "[t]he testimony of a spouse seeking to overcome the community property presumption need not be corroborated to meet the clear and convincing standard." Our sister courts have reached the same conclusion. *Vannerson v. Vannerson*, 857 S.W.2d 659 (Tex. App.—Houston [1st Dist.] 1993, writ denied) (wife's testimony that items on inventory list were her separate property provided sufficient evidence to support separate property characterization where husband presented no evidence to the contrary); *Monroe v. Monroe*, 358 S.W.3d 711 (Tex. App.—San Antonio 2011, pet. denied) (wife's uncontradicted testimony that her jewelry was separate property because she either owned it before marriage or received it as a gift after marriage established, as a matter of law, that the jewelry was her separate property).

Leslie contends the probate court erroneously characterized the following "other space artifacts" as Alan's separate property:

- Biomedical Harness worn by Bean LM-6 Apollo 12 (Item #1)

- Nine silver Robbins Medallions from the Apollo 7, 9, 10, 14, 15, and 16 missions (Items #s 2–10)

- Two groups of manned flight awareness medals from the Apollo 8 and 11 missions (Item #s 11, 13)

- Skylab Manned Flight Awareness Medal Flown May 14,1973 to Feb 6, 1974 (Item # 12)

- Silver Skylab 2 (Mission I) Robbins Medallion Serial No. 12 Flown (Item # 34)

- Silver Skylab 2 (Mission I) Robbins Medallion Serial No. 294 Unflown (Item # 35)

- Skylab 2 Mission Emblem Sticker (Item # 38)

She maintains summary judgment should not have been granted because Amy did not overcome the community property presumption as to "the other space artifacts." We disagree.

Amy presented the probate court with uncontroverted, clear and convincing evidence that Alan acquired the 39 Space Artifacts before his marriage to Leslie. This evidence included the property settlement between Alan and Sue, the prenuptial agreement between Alan and Leslie, Alan's Will, and the Form 706 Leslie filed with the Internal Revenue Service under penalty of perjury identifying the 39 Space Artifacts as Alan's separate property. The evidence was uncontroverted that the 39 Space Artifacts were in Alan's possession before his marriage to Leslie. In his Will,

Alan stated he received the artifacts and mementos during his NASA career. He retired from NASA before marrying Leslie. Those documents and Alan's statements within them constitute clear and convincing evidence that the 39 Space Artifacts were in his possession and claimed by him as separate property before July 15, 1982. Leslie presented no evidence to controvert Amy's evidence. Indeed, she confirmed Alan's statements by signing the prenuptial agreement and filing the Form 706.

Moreover, Amy presented uncontroverted evidence that the items carved out by Leslie as "other space artifacts" were in Alan's possession before his marriage to Leslie. For example, the biomedical harness, Skylab manned flight awareness medal, and patches from Alan's Apollo 12 spacesuit were worn by or carried by Alan into space during his Apollo or Skylab III missions. In his Will, Alan states "certain artifacts, which flew aboard" the Apollo 12 and Skylab 3, Mission II flights were given to him by "NASA through officials at the Johnson Space Center." The Will states those artifacts are Alan's "personal property and should not be returned to NASA nor should they be brought to the undue attention of the U.S. Government." Those flights occurred years before Alan married Leslie. Alan's use of those items during those flights establishes his possession of them before his marriage to Leslie.

Further, in the property settlement and prenuptial agreement, Alan described his separate property as encompassing the following:

- "All space pictures, mementos, awards."

- "Alan Bean's desk and contents, chair and lamp. All books, awards, artifacts, etc." in Alan's study.

- "½ of all space flown Apollo and Skylab flags and medallions."

- "All space related photographs, models, mementos, awards, coins, stamps, souveniers [sic], jewelry except for one Apollo 12 silver medallion."

- "All flags, jewelry, medallions, and other items that were taken by Alan L. Bean on space flights."

- "All contents" of Alan's carved desk.

The remaining items within "the other space artifacts" category are medallions, medals, and emblems. They, therefore, are items described by Alan as his separate property in the Will, the property settlement, and prenuptial agreement. At a minimum, those items are mementos as set out in the Will and its attachments.

Under this record, we conclude that the trial court could "reasonably have formed a firm conviction or belief" that the "other space artifacts" were in Alan's possession before his marriage to Leslie and were, therefore, his separate property.

## III.    Tom's characterization of the space artifacts

In a February 20, 2020 email to counsel, Tom interpreted HR 4158 and decided "title to space artifacts in Alan's possession had not been vested in Alan prior to the date of House Bill 4158 and therefore constituted community property at his death." Leslie asserts the probate court erred by disregarding Tom's decision because that decision was "final and binding" pursuant to the Will. We disagree.

A provision in a will making the executor's decision on disputed questions regarding the will's construction binding on all interested parties is generally valid. *Nations v. Ulmer*, 139 S.W.2d 352, 356 (Tex. App.—El Paso 1940, writ dism'd).

–29–

Such decisions by the executor, if fairly and honestly made and reasonably susceptible to the terms of the will, are binding and final on all interested parties. *Id.*; *Key v. Metcalf*, No. 14-04-00782-CV, 2006 WL 348149, at \*2 (Tex. App.—Houston [14th Dist.] Feb. 16, 2006, no pet.) (mem. op.). However, a gross departure from the testator's intent cannot be considered an honest endeavor by the executor to determine that intent. *Pray v. Belt*, 26 U.S. (1 Pet.) 670, 680 (1828). The executor's construction of the will is subject to court review "[i]f an unreasonable use be made of such a power so given in a will, one not foreseen, and which could not be intended by the testator . . . ." *Id.* Such is the case here.

Throughout his life, Alan consistently maintained that his space artifacts and mementos were his separate property. This was central to his property settlement with Sue and the prenuptial agreement with Leslie. He vehemently reiterated this view in the Will. Indeed, the Will included fifteen pages of detailed explanations and instructions concerning Alan's space artifacts and mementos. Alan adamantly believed his space artifacts and mementos were his separate property and explicitly provided those items should remain his separate property and be distributed after his death per his instructions in the Will. Tom's decision to characterize all of Alan's space artifacts and mementos as community property directly contradicts Alan's stated intent. The decision is such a gross departure from Alan's intent that it cannot be considered an honest endeavor by Tom to determine that intent. Further, there is some evidence to support a finding that Tom acted with bias toward Amy and in

–30–

favor of Leslie. In his affidavit, Tom testified he knew his role was to determine disputes fairly. However, he also conceded that he viewed his role was to protect Leslie because Alan knew Amy "was often tough on and in disagreement with Leslie." This evidence of slight bias in favor of Leslie further supported the probate court's decision to review Tom's determination of how to characterize the 39 Space Artifacts.

Moreover, the probate court properly disregarded Tom's decision. Not only does the decision directly contradict Alan's stated intent, but the decision is a legal one properly delegated to the probate court. The Will provided for Tom to break ties concerning issues related to the administration of the estate on which Leslie and Amy could not agree. That tie-breaker role does not explicitly or implicitly provide Tom with the authority to make legal decisions such as determining Alan's intent or applying a legal characterization to property of the estate. Tom is not an attorney and lacks the education and training to interpret a federal statute and determine its legal meaning. Amy had a right to have such decisions addressed by the probate court. *See*, *e.g.*, TEX. CIV. PRAC. & REM. CODE § 37.004(a) (interested persons under a will "may have determined any question of construction or validity arising under the instrument, . . . and obtain a declaration of rights, status, or other legal relations thereunder."). Indeed, the characterization of marital property is routinely submitted to courts as a declaratory judgment in independent administrations. *E.g.*, *In re Estate of Wilson*, 7 S.W.3d 169, 172 (Tex. App.—Eastland 1999, pet. denied) (declaratory

–31–

judgment action was appropriate means for testator's daughter to seek construction of will); *Donalson v. Harrington*, No. 09-19-00286-CV, 2021 WL 3196970, at *3 (Tex. App.—Beaumont July 29, 2021, no pet.) (mem. op.) (party sought declaratory judgment characterizing marital property).

Finally, we reject Leslie's contentions that Amy was barred from challenging Tom's decision by res judicata or collateral estoppel. The doctrine of res judicata requires proof of the following elements: (1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of parties or those in privity with them; and (3) a second action based on the same claims that were raised or could have been raised in the first action. *Frost Nat'l Bank v. Burge*, 29 S.W.3d 580, 595 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (citing *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 652 (Tex.1996)). Likewise, "[a] prior adjudication of an issue will be given estoppel effect only if it was adequately deliberated and firm." *Id.* (quoting *Mower v. Boyer*, 811 S.W.2d 560, 562 (Tex. 1991)). That determination requires a showing that (1) the parties were fully heard; (2) the court supported its decision with a reasoned opinion; and (3) the decision was subject to appeal or was in fact reviewed on appeal. *Id.* Tom's decision was not a final judgment on the merits by a court of competent jurisdiction and was not made after adequate deliberation allowing the parties to be fully heard. These doctrines are inapplicable under these facts.

Under this record, we conclude the probate court properly reviewed Tom's decision and did not err by disregarding that decision.

## CONCLUSION

We find no error in the probate court's characterization of the 39 Space Artifacts as Alan's separate property. Accordingly, we affirm the trial court's December 23, 2020 order granting Amy's second amended motion for partial summary judgment.

/Robbie Partida-Kipness/
ROBBIE PARTIDA-KIPNESS
JUSTICE

210286F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

LESLIE BEAN, Appellant

No. 05-21-00286-CV     V.

AMY SUE BEAN, Appellee

On Appeal from the Probate Court
No 2, Harris County, Texas
Trial Court Cause No. 467,316-402.
Opinion delivered by Justice Partida-
Kipness. Justices Reichek and
Goldstein participating.

     In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

     It is **ORDERED** that appellee AMY SUE BEAN recover her costs of this appeal from appellant LESLIE BEAN.

Judgment entered this 13th day of December 2022.